## WARNER v. TENNESSEE PRODUCTS CORPORATION.

### No. 5851.

Circuit Court of Appeals, Sixth Circuit.
April 5, 1932.

See also 39 F.(2d) 200.

Ed T. Seay, of Nashville, Tenn., and John Boyle, Jr., of Washington, D. C., for appellant.

C. P. Hatcher, of Nashville, Tenn., and S. E. Darby, of New York City (Pitts, McConnico & Hatcher, of Nashville, Tenn., on the brief), for appellee.

Before MOORMAN and HICKENLOOPER, Circuit Judges, and HAHN, District Judge.

## HICKENLOOPER, Circuit Judge.

Appellee brought action in the court below for an infringement of patent No. 1,220,416, for a process of making ferrophosphorus in a blast furnace, granted March 27, 1917, to one J. J. Gray, Jr., and subsequently assigned to the appellee, hereinafter referred to as complainant. On July 10, 1924, the patentee Gray had filed a bill of complaint against the present appellant, defendant below, charging infringement of the same patent now in suit. Such action was fully tried and submitted to the court, but before decision was rendered the parties agreed upon a consent decree adjudicating the patent valid and infringed, and adjusting the matter of profits and damages. Thereafter Gray assigned the patent to the present complainant.

 It is conceded by the defendant, and in view of the authorities the rule could not well be otherwise, that this adjudication in 1924, although by consent, constitutes an estoppel by judgment binding upon the parties or their privies, and that all questions of law and fact distinctly put in issue and determined by the decree cannot be disputed in a subsequent suit between such parties or their privies. Southern Pacific R. Co. v. U. S., 168 U. S. 1, 18 S. Ct. 18, 42 L. Ed. 355; Nashville, C. & St. L. R. Co. v. U. S., 113 U. S. 261, 5 S. Ct. 460, 28 L. Ed. 971; Ingraham Co. v. Germanow, 4 F.(2d) 1002 (C. C. A. 2); Vapor Car Heating Co. v. Gold Car Heating & Lighting Co., 7 F. (2d) 284, 287 (C. C. A. 2). Cf. Hart Steel Co. v. Railroad Supply Co., 244 U. S. 294, 37 S. Ct. 506, 61 L. Ed. 1148. It is therefore wholly unnecessary for us to determine the question of the validity of the patent in suit, or whether the process practiced by the defendant in 1924 should properly have been considered an infringement. Had Gray not assigned the patent to complainant, presumably the present questions would have been raised in contempt proceedings (Leman et al. v. Krentler-Arnold Hinge Last Co., 284 U. S. 448, 52 S. Ct. 238, 76 L. Ed. ——), and then the principal question for our determination would have been, as it is now, whether the process practiced at the later date (1929) was essentially and substantially the same as the process adjudicated an infringement in 1924. Roberts Cone Mfg. Co. v. Bruckman, 266 F. 986 (C. C. A. 9). Cf. Buckeye Incubator Co. v. Boling, 46 F.(2d) 965 (C. C. A. 6).

It is the contention of the defendant that at the time of the alleged infringement of 1929 he was practicing the two-step process covered by patent No. 1,646,268, granted to him October 18, 1927; that the patent in suit was one in an already crowded art, purporting to be merely an improvement over the process disclosed in the prior patent to Gray, No. 831,427, September 18, 1906; that the claims in suit, although accepted as valid, must therefore be strictly construed as limited to a one-step process made operable only by the use in the burden of the blast furnace of an extra charge of coke every fifth charge, followed immediately by a straight pig iron charge; and that, when the claims are so construed, it is apparent that they are not infringed, for the simple reason that the defendant did not use the extra charge of coke every fifth charge, or the pig iron charge which followed it.

Except for the estoppel above mentioned, the defendant's argument would have much to commend it. Ferrophosphorus is an alloy of iron and phosphorus. In order to be merchantable it must contain at least 17 per cent. of phosphorus, and throughout the record it is apparently assumed that the patent in suit is limited to production of the commercial product. That which contains less than 17 per cent. phosphorus is spoken of as "off-ferrophosphorus." In the ordinary pig iron operation of a blast furnace the furnace is charged with suitable quantities of iron ore and limestone. The heat necessary to reduce the iron ore and limestone to their elemental ingredients is supplied by the ignited coke to which a blast of superheated air is transmitted. Limestone is used to the end that its lime content may flux the silicates contained in the iron ore. The result is a molten slag which may be drawn off through tap holes. The elemental iron passes through the burden of the furnace to its bottom or hearth, whence it is likewise drawn off and cast into pigs. In his first patent, No. 831,427, Gray disclosed a process for producing ferrophosphorus by substituting phosphate rock (phosphate of lime) for limestone and smelting the mixture. In practicing this process it is obviously necessary to increase greatly the quantity of phosphate rock, over the limestone previously used in the pig iron practices, in or-

der to secure the desired quantities of phosphorus in the resulting alloy. The patent says nothing as to any increase in the coke content of the charge, except that "it should be noted that care must be exercised in the operation of the furnace to obtain the desired phosphorus content and the heat and blast regulated from time to time to adapt them to the varying conditions of the furnace, as will be understood by those skilled in the art," but it is apparent that if the quantity of rock to be reduced be largely increased, a corresponding increase in the heat-producing coke must be made. The increase in the quantity of phosphate rock also resulted in a marked increase in the lime content, requiring the addition of silicious material to produce a proper flux. Under this patent much is left to the understanding of those "skilled in the art," for the process is claimed simply as consisting "in charging the blast furnace with a mixture of iron ore, a neutral phosphate, and sufficient silica to free the desired amount of phosphorus therefrom, and then smelting the mixture."

Before the date of filing application for the patent in suit, another patent was issued to Gray, No. 1,168,495, January 18, 1916, hereinafter referred to as Gray's second patent. While this patent purports to deal with the process of simultaneously producing phosphorus and phosphids in a blast furnace, and while it goes into much greater detail as to the chemical and physical reactions taking place within the furnace than does his first patent, the disclosure includes, and the claims read upon, the operation of producing ferrophosphorus here involved unless, as hereinafter noted, additional steps (the pig iron and extra coke charges) were added by the patent in suit. As to the quantities of coke and air necessary, this second patent says: "Only sufficient coke is used to provide sufficient heat to bring about the desired chemical reactions between the various elements and to produce and maintain in the furnace more than enough carbon monoxide CO, than is necessary for the deoxidation of the phosphorus compounds liberated by the operation. The air is also used in quantities *insufficient to completely ignite the coke or other carbon materials,* and only in quantities sufficient to supply the oxygen necessary to the production of the requisite heat in the furnace and to form a portion of the carbon monoxide." (Italics ours.) The claims provide for charging the blast furnace with "a suitable mixture containing said phosphate, sufficient silica to liberate the desired amount of phosphorus, metal sufficient to make the desired amount of phosphids and to produce the desired fluidity in the slag," and "sufficient carbon to bring about the desired reactions." Here also, so far as the claims are concerned, much is left to the experience of those skilled in the art.

In Gray's patent in suit, No. 1,220,416, the elements of novelty which it is insisted are introduced by the claims consist of "maintaining free uncombined carbon in the fusion zone of the furnace; maintaining a temperature in said fusion zone sufficient in the presence of said free carbon to reduce the phosphorus of said phosphatic material to the elemental condition; and maintaining such top temperature as will facilitate the entry of the phosphorus into the iron present." The regulation of the temperature in the fusion zone and of the top temperature is accomplished by regulation of the quantity and temperature of air supplied to the furnace, and it is difficult to see why this and the call for free uncombined carbon in the fusion zone of the furnace were not both present in the processes of the earlier patents, especially the second. Free carbon in the fusion zone means simply coke which is not yet consumed, and the continuous presence of such coke undergoing consumption is an essential of each of the former methods. It is sought to interpret these words as calling for an amount of coke in excess of that required by pig iron practices, but such contention fails to take into consideration the latitude as to heat regulation permitted by the first Gray patent, the provision of the second Gray patent for the use of sufficient carbon to bring about the desired reactions and of insufficient air to completely ignite the coke, or the obvious necessity of increasing the quantity of coke where the quantity of lime-bearing rock and silicates is greatly increased.

It is quite clear from the record that during his experiments which led to the application for the patent in suit Gray encountered serious difficulties due primarily to the large quantities of lime phosphate and silicates, the smelting of which was required by his one-step process. With the introduction of these insolubles the slag became viscous and refractory to such a degree as even to clog the outlets and interfere with tapping operations. Scaffolding of these refractory masses also appeared at the higher levels of the furnace. The remedy suggested by the patent was the introduction at regular intervals of an ordinary pig iron charge, and an increase in the amount of the coke that is usually employed with a pig iron

charge. "The effect of employing these pig iron charges is to provide an excess of coke near the bottom of the fusion zone which there produces a high temperature and melts the said accumulated mass." Page 3, line 93, of the patent. In other words, it was assumed that an increase in temperature would have the effect of melting the refractory slag, while the pig iron charge would operate to some degree in flushing it. As already stated, it is difficult to differentiate this disclosure of the patent in suit from the regulation of heat and blast from time to time to adapt them to the varying conditions of the furnace, as provided in Gray's first patent, or from the use of sufficient carbon to bring about the desired reactions and to supply a reducing atmosphere in the furnace, and of insufficient air to completely ignite the coke, as covered by his second patent, unless the periodic pig iron and extra coke charges are to be regarded as essential steps in the process.

In the patent to Warner, No. 1,646,268, the departure from the Gray practice would seem to consist in using "only enough phosphate rock or bone phosphate of lime [as will] combine with the limited amount of silicious and other acid matters in the coke, the phosphate rock, and the iron bearing material." In other words, the proportion of phosphate rock in the charge is reduced. In this manner the patentee claims to produce by his first operation ferrophosphorus containing on an average from 10 to 16 per cent. of phosphorus. This is unmerchantable, and it is then fed back through the furnace in addition to the burden of coke, phosphate rock, and iron-bearing material originally used. The result is said to be a ferrophosphorus of unusually high phosphorus content. We are not here called upon to decide whether a strict adherence to the patented two-step process would avoid infringement of the patent in suit. We may assume that it would, that Gray's patent covered only the one-step process, and that the Warner method avoided the difficulties of clogging outlets, scaffolding, and a dirty hearth in a substantially different manner than did the process used by Gray under the patent in suit. The difficulty with which we are confronted is that the court below found that there was no substantial difference between the alleged infringing practices of the defendant in 1929 and those upon which recovery was predicated in 1924, and the present record would seem adequately to support this fact finding.

In his 1929 operation the defendant used only 1.065 tons of coke for each ton of phosphate rock, while in his 1924 operations he averaged 1.23 tons of coke per ton of phosphate rock. This demonstrates that the proportion of phosphate rock to coke used was increased, not decreased, as contemplated by his two-step process patent. It is true that in the 1929 operation the defendant used no additional silicious material, but he supplied the necessary silicates by the use of high silicious-bearing iron ores. There is also a surprising identity in each of the two years between the proportions of scrap iron, phosphate rock, iron ore, and coke, to the commercial ferrophosphorus ultimately produced. Since the difference between the processes of the Gray patent in suit and the Warner patent, No. 1,646,268, as we see it, consisted of substantially reducing the proportion of phosphate rock in each charge of the furnace, we are unable to accede to the contention that the defendant was following his patented two-step process or had made a substantial departure from that of the patent in suit. It also appears that on a number of days the second step of defendant's alleged process was apparently entirely omitted; that is, commercial ferrophosphorus was produced by the single-step method. Conceding the validity of the patent, as it must here be conceded, it is therefore quite obvious that on those days at least, and as to the commercial ferrophosphorus thus produced, the defendant has infringed.

We do not overlook the earnest contention of the defendant that the 1924 practice was then claimed to be, and must now be assumed to have been, an exact or "Chinese" copy of the process of the patent in suit, while the 1929 practice omitted entirely the pig iron charge and the extra charge of coke every fifth charge, and that one or both of these elements must be read into the claims to give them validity and novelty in view of the prior art. Were the operations of the two years substantially different, this contention might well have a place in the determination of the question of infringement, but upon the present record we are unable to say that the court below erred in finding a lack of such substantial difference in defendant's two operations. In this position we are fortified by the apparent admission of the defendant that the only change he made in 1929 was the substitution of more metallic iron for iron ore in the charges. Lacking such substantial difference between the earlier and later practices, the matter of

infringement as to the later, as we have already stated, must be considered as res judicata between the parties. An argument based upon claim construction has, therefore, no place in the decision of the present case.

The decree of the court below not only enjoined continued infringement of the patent in suit and ordered an accounting of profits and damages, but included in the injunction the leasing and licensing by defendant of rights under his patent No. 1,646,268. In this we are of the opinion that the court below erred. The validity of this patent was not and could not have been directly put in issue by complainant under its bill in the present action. No counterclaim thereon was asserted. Even assuming that the process therein patented cannot be practiced without infringement of the Gray patent No. 1,220,416, an assumption which is apparently far from justified by the present record, and regarding the Warner method as merely an improvement upon that of the Gray patent, the defendant would still be entitled to the monopolistic enjoyment of his process after the earlier expiration of the patent in suit. A perpetual injunction as to it is therefore clearly inappropriate.

Objection is also made by the defendant to that part of the decree which enjoins the making, selling, or distributing of any of the product made by the exercise or use of the process of the patent in suit, and in decreeing an accounting as from January 1, 1929, in the absence of the notice provided by Rev. St. § 4900 (35 USCA § 49). As to the first of these matters, if the product made by the infringing use of the patented process remains unsold, there can be no element of profits or damages arising from the infringement. The amount so remaining unsold would therefore be excluded from consideration on the accounting, but we see no valid objection to this portion of the injunction as such. Fulton Co. v. Bishop & Babcock Co., 17 F.(2d) 1006 (C. C. A. 6). As to the second proposition we are of the opinion that the first suit was sufficient notice of infringement and that the court did not err in fixing the time to be covered by the accounting. Compare Oil Well Imp. Co. v. Acme Foundry & Mach. Co., 31 F.(2d) 898 (C. C. A. 8). Actual notice of the issue and contents of the patent, and of the claim that a practice infringes, is sufficient regardless of the source of such notice, if, in fact, Rev. St. § 4900 applies at all to process patents. Wagner v. Corn Products Ref. Co., 28 F. (2d) 617 (D. C., N. J.).

For the reasons above stated, the decree of the District Court will be modified by striking therefrom all reference to the defendant's so-called two-step process, and, as modified, is affirmed. Costs in this court will be divided in the proportions of the appellant paying three-fourths and the appellee one-fourth thereof.