## BARBER–COLMAN CO. v. NATIONAL TOOL CO.

### No. 9321.

Circuit Court of Appeals, Sixth Circuit.

June 3, 1943.

Edward R. Johnston, of Chicago, Ill. (William E. Chilton, of Cleveland, Ohio, and C. Paul Parker and Parker, Carlson, Pitzner & Hubbard, all of Chicago, Ill., on the brief), for appellant.

Samuel J. Kornhauser and William R. Day, both of Cleveland, Ohio (Oberlin, Limbach & Day, of Cleveland, Ohio, on the brief), for appellee.

Before HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The contestants agree that the decisive question to be answered on this appeal is whether the owner of a process patent who also owns a patent for a machine designed for operation in conjunction with the patented process may, by license agreement, control the selling price of the article produced by use of the patented machine and process, where no patent covers the article sold.

The appeal is from the judgment of the District Court dismissing, on motion for summary judgment, the bill of complaint of the appellant licensor for equitable relief against the violation by the appellee licensee of the price control clause of the license agreement.

The process patent (Edgar, Reissue No. 18,246), owned by the appellant, Barber-Colman Company, covered a method of grinding hobs, and its machine patent (Edgar, Reissue No. 18,247) described a "hob-grinding machine." Appellant concedes that "hobs, ground and unground, have been long known to the trade and are not covered by patents," and that its process patent covers only a particular method of grinding hobs.

A hob is a hardened steel tool used to cut gears, splined shafts, sprockets, ratchets and other toothed elements for use in automobiles and in many kinds of precision machinery. Accuracy in the form, surface smoothness and dimensions of hobs is essential. In the hardening process, hobs

suffer slight deformations, which might not prevent their use for cutting gears employed for ordinary purposes, but would be destructive of the higher degree of accuracy of contour required for precision work. Perfection of contour can be attained only by grinding, which, for a long time, has been practiced in the art.

The appellant's patents cover only a particular *method* of grinding hobs and a *machine* for the performance of that method. In his affidavit, attached to the bill of complaint, appellant's Works Manager admitted that "ground hobs are made and sold today, and have been for many years, that are not ground on the machine or according to the method" of the appellant's patents. The affiant stated, moreover: "The defendant in this case [the appellee, National Tool Company] claims to have and to use a method for grinding hobs, the use of which admittedly does not infringe the plaintiff's patent."

The appellant has based its business of manufacturing and grinding hobs on its Edgar Patents. Its own operations account for about one-third of all hobs ground in the United States, exclusive of the hobs manufactured and ground by its licensees, all of whom covenanted that they would not sell in the United States ground hobs manufactured by the use of appellant's patented method at prices lower than those maintained by the appellant in selling ground hobs of its own manufacture.

The license agreement between the appellant licensor and the appellee granted the right to manufacture, but not to sell, the patented machine and to use the patented process for the commercial production of ground hobs. Neither the machine nor the method were designed to produce hobs, but only to perform the single function of grinding.

A number of similar agreements had been made with other tool companies at the time of the execution of the license agreement in controversy, it being recited in that document that the appellant was willing to open further its monopoly "to the use of other manufacturers for the grinding of hobs and the building of hob-grinding machines for their own respective uses therefor upon payment of a reasonable royalty, provided it be assured that in so doing the ground-hob business of itself and its Licensees be not ruined or injured by the cutting of prices." To that end, the seventh paragraph of the license agreement provided that the appellee licensee would not sell, for use in the United States, ground hobs produced by any machine or in accordance with any method covered by the two Letters Patent owned by appellant for less than the prices established from time to time for the sale by appellant "of the same or equivalent items."

Appellant insists that this price maintenance clause in the license agreement is lawful. Its argument is that, inasmuch as the owner of a *product patent* has the right to fix the price at which his licensee shall sell the patented product, the owner of a *process patent* has a corresponding right to fix the price at which his licensee to use the process may sell the product manufactured through its use.

■ The doctrine of Bement & Sons v. National Harrow Company, 186 U.S. 70, 91, 22 S.Ct. 747, 755, 46 L.Ed. 1058, is appellant's chief dependence. In the Bement case, sweeping pronouncement was made that "the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States." The Supreme Court elucidated: "The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal." The holding in the case, however, merely sustained the right of the patentee of an article to license the manufacture and sale of the *patented article* upon condition that the licensee should charge a fixed minimum sales price for it.

In another decision emphasized by appellant, United States v. General Electric Company, 272 U.S. 476, 485, 493, 47 S.Ct. 192, 198, 71 L.Ed. 362, the Supreme Court said that "price fixing is usually the essence of that which secures proper reward to the patentee"; that it is immaterial how widespread his monopoly may become, so long as "he makes no effort to fasten upon ownership of the articles he sells control of the prices at which his purchaser shall sell"; and that only when in combination with others the patentee "steps out of the scope of his patent rights and seeks to control and restrain those to whom he has sold his patented articles in their sub-

sequent disposition of what is theirs" does he come within the operation of the Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The authority of Bement & Sons v. National Harrow Company, supra, was said not to have been shaken by intervening decisions of the court. But, for their relevancy upon the instant issue, these two opinions of the Supreme Court may be evaluated only by thoughtful study of numerous other decisions of the court in the field of constant conflict between the principle that a patentee has, by statute, 35 U.S.C.A. § 40 "the exclusive right to make, use, and vend" his invention or discovery, and the inhibition by the Anti-Trust laws of the United States, and to a degree by the common law as well, of restraint of trade or commerce and of unlawful combination in restraint or monopoly of trade or commerce.

Only those opinions of the highest court which appear to furnish true guidance upon the issue here will be reviewed, and those selected will be discussed in chronological order, which seems the clearest method of exposition of the expanding juristic concept of appropriate restraint of monopoly.

■ Chief Justice Taney, in Bloomer v. McQuewan, 14 How. 539, 55 U.S. 539, 549, 14 L.Ed. 532, decided in 1852, declared that the purchaser of a patented implement or machine for use "in the ordinary pursuits of life" exercises in its use no rights created by the Act of Congress, and does not derive title by virtue of the franchise or exclusive privilege granted to the patentee; and that, when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly, or under protection of the Act of Congress.

■ With credit to this eminent authoritative source, Mr. Justice Miller, in Adams v. Burke, 1873, 17 Wall. 453, 84 U.S. 453, 456, 21 L.Ed. 700, asserted that when the patentee or his assignee sells a machine, whose sole value is in its use, and receives in the act of sale all the royalty or consideration claimed "for the use of his invention in that particular machine," he parts with the right to restrict the purchaser's use.

In Bauer & Cie v. O'Donnell, 229 U.S. 1, 18, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A., N.S., 1185, Ann.Cas.1915A, 150, the Supreme Court quoted the language of Adams v. Burke condensed in the foregoing paragraph; and held that a patentee may not by notice limit the price at which future retail sales of a patented article may be made, when the article is in the hands of a retailer by purchase from a jobber, who has paid to the agent of the patentee the full price asked for the article sold.

The evolution of the motion picture industry occasioned the Supreme Court to hold that neither a patentee nor his assignee may license another to manufacture and sell a patented motion picture machine and, by a mere notice attached thereto, limit its use by the purchaser or his lessee to unpatented films constituting no part of the patented machine. Motion Picture Patents Company v. Universal Film Manufacturing Company, 243 U.S. 502, 516, 519, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959. It was pointed out that, following the decision of the Button-Fastener case, Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co., 6 Cir., 77 F. 288, 35 L.R.A. 728, the contention had been made widely that the owner of a patent has the right, under penalty of patent infringement, to fix the price at which his patented article may be sold and resold, but that in Bauer v. O'Donnell, supra, the Supreme Court had refused to place that interpretation upon the Act of Congress. Mr. Justice Clarke said [243 U.S. 502, 37 S.Ct. 421, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959]: "A restriction which would give to the plaintiff such a potential power for evil over an industry which must be recognized as an important element in the amusement life of the nation, under the conclusions we have stated in this opinion, is plainly void, because wholly without the scope and purpose of our patent laws, and because, if sustained, it would be gravely injurious to that public interest, which we have seen is more a favorite of the law than is the promotion of private fortunes."

The observation should be made that, in the Motion Picture case, decision was not based upon the effect of the Sherman or Clayton Acts; but that in United States v. Trenton Potteries Company, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, the Sherman Anti-Trust Law, 15 U.S.C.A. § 1–7, 15 note, *was* directly involved, though not in the context of *patent* monopoly. Stating that the Sherman Act and interpretative judicial decisions respecting it are based upon the assumption that the public interest is best protected

from the evils of monopoly and price control by the maintenance of competition, the Court held that an agreement, among those controlling more than eighty percent of the business of manufacturing and distributing sanitary pottery in the United States, to fix and maintain uniform prices, whether reasonable or not, was violative of the Sherman Act.

Finding the relief sought indistinguishable from that denied in the Motion Picture case, the Supreme Court again held, in Carbice Corporation of America v. American Patents Development Corporation, 283 U.S. 27, 31, that a patentee may not lawfully exact, as the condition of a license, that unpatented materials used in connection with his invention be purchased exclusively from him. The patentee and its exclusive licensee had neither sold nor licensed others to sell "complete transportation packages," but had merely supplied one of the several materials used in the packages, in which the claimed invention was employment of solid carbon dioxide in a new combination. The Court declared that no monopoly had been granted in the commodity and that the attempt to secure one could not be sanctioned. Conceding that a patentee may prohibit the manufacture, sale or use of his invention, or grant licenses upon terms consistent with the limited scope of the patent monopoly (United States v. General Electric Company, supra), charge royalties and license fees, the opinion stated that an attempt to limit a licensee to the use of unpatented materials purchased from the licensor is comparable to an attempt by the patentee to fix the price at which the patented article may be resold. The attempt to use a patent unreasonably to restrain commerce was considered not only beyond the scope of the grant of the patent, but also in direct violation of the Anti-Trust Acts. The opinion writer noted that the Clayton Act of October 15, 1914, c. 323, sec. 3, 38 Stat. 731, 15 U.S.C.A. § 14, prohibits any lease, sale, contract, or agreement tending to create a monopoly in any line of commerce, and is applicable to all goods, wares, merchandise, machinery, supplies or other commodities, *whether patented or unpatented*.

Again writing for the court, Mr. Justice Brandeis, in Leitch Manufacturing Co. v. Barber Company, 302 U.S. 458, 463, 58 S.Ct. 288, 82 L.Ed. 371, explained that the rule of the Carbice case applies, regardless of the nature of the device by which the owner of a patent seeks to effect an unauthorized extension of his monopoly; and that the rule applies whether the patent be for a machine, a product or a *process*.

Upon charges of violation of the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S. C.A., sec. 1, as amended August 17, 1937, 50 Stat. 693, 15 U.S.C.A. § 1, the Government brought suit in a United States District Court to restrain a corporation and its officers from granting, under patents controlled by the corporation, licenses to jobbers to sell and distribute lead-treated motor fuel, and from enforcing provisions in licenses to oil refiners which restricted their sale of the motor fuel to the licensed jobbers. The Supreme Court upheld the action of the District Court in deciding the controversy in favor of the Government, cited and adhered to its previous opinions relating to the scope of the patent monopoly, and stated that by the authorized sales of the fuel by refiners to jobbers the patent monopoly over the fuel was exhausted; and that, after the sale, neither the patentee nor the refiners could longer rely upon the patents for the exercise of any control over the price at which the fuel might be resold. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 455, 459, 60 S.Ct. 618, 84 L.Ed. 852.

In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129, the statement was made that for more than forty years the Supreme Court had consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act; that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate might be interposed as a defense; and that this well established rule had been reaffirmed in clear and unequivocal terms in Ethyl Gasoline Corporation v. United States, supra.

On January 5, 1942, the Supreme Court promulgated two opinions which resolve all doubt, if any be left, as to the correctness of the course pursued by the District Court in dismissing the instant civil action on motion for summary judgment: Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367. In the first of these cases, the patentee of a machine for depositing salt tablets brought

344

suit for an injunction and an accounting for alleged infringement of its patent. The defense was that the plaintiff was making use of its patent to restrain the sale of salt tablets in competition with its own sale of unpatented tablets, by requiring licensees to use with the patented machines only tablets sold by the plaintiff. The District Court, on motion for summary judgment, dismissed the complaint and the Supreme Court affirmed that action. It was deemed unnecessary to decide whether there had been a violation of the Clayton Act, for the reason that a court of equity will not aid the protection of patent monopoly, when attempted to be used as the effective means of restraining competition with the patentee's sale of an unpatented article. Attention was directed to the principle of general application that courts and especially courts of equity may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest. In the second case, the holding was that the owner of a *method patent* who authorizes manufacturers to use it only with materials furnished by him could not enjoin infringement by one who supplies the manufacturer with materials for use by the patented method and aids in such use.

A few months after the opinion in the Salt Company and Chemical Company cases, supra, were delivered, the Supreme Court on May 11, 1942, again announced simultaneously two opinions, which indicate that the judgment in the case at bar should be affirmed: United States v. Univis Lens Co., 316 U.S. 241, 250, 251, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Masonite Corporation, 316 U.S. 265, 280, 282, 62 S.Ct. 1070, 86 L.Ed. 1461.

It would be of no avail to lengthen this opinion unduly by describing the complicated licensing system disclosed in the Univis Lens case. The rationale of the decision is revealed in the following language of the Chief Justice (op. 250, 251, of 316 U.S., page 1093 of 62 S.Ct., 86 L.Ed. 1461): " * * * where one has sold an uncompleted article which, because it embodies essential features of his patented invention, is within the protection of his patent, and has destined the article to be finished by the purchaser in conformity to the patent, he has sold his invention so far as it is or may be embodied in that particular article. The reward he has demanded and received is for the article and the invention which it embodies and which his vendee is to practice upon it. He has thus parted with his right to assert the patent monopoly with respect to it and is no longer free to control the price at which it may be sold either in its unfinished or finished form."

In the Masonite case, numerous corporations, in active competition as dealers in building materials, had entered into a combination whereby one of the group, a manufacturer and seller of "hardboard," for which he held a patent, constituted the other members of the group del credere agents for the sale of "hardboard" at prices fixed by the owner of the patent. The Supreme Court held [316 U.S. 265, 62 S.Ct. 1079, 86 L.Ed. 1461] that "the power of this type of combination to inflict the kind of public injury which the Sherman Act condemns renders it illegal per se." The opinion writer said that "since patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute."

The decisions and pronouncements of the Supreme Court which have been reviewed so plainly demonstrate that the judgment of the District Court was correct that citation of opinions of inferior courts of the United States would merely add surplusage. Suffice it to say that Sylvania Industrial Corporation v. Visking Corporation, 4 Cir., 132 F.2d 947, 955, applied the same principles which we have found pertinent here. We are not in accord with the decision in Straight Side Basket Corporation v. Webster Basket Co., 2 Cir., 82 F.2d 245. The two cases from this circuit, cited by appellant, shed no light on the instant controversy. Fulton Co. v. Bishop & Babcock Co., 6 Cir., 17 F.2d 1006; Warner v. Tennessee Products Corporation, 6 Cir., 57 F.2d 642.

The judgment of the District Court is affirmed.