**Howard B. MILLER and F M C Corporation, Plaintiffs,**

v.

**DAYBROOK–OTTAWA CORPORATION et al., Defendants and Counterclaimants.**

**No. C 65–226.**

United States District Court
N. D. Ohio, W. D.
July 17, 1968.

Donald R. Fraser, Toledo, Ohio, Harold C. Hohbach, San Francisco, Cal., for plaintiffs.

Albert L. Ely, Jr., Cleveland, Ohio, for defendants.

## OPINION

DON J. YOUNG, District Judge.

This is an action for infringement of Patent No. 2,450,152, issued September 28, 1948, to Howard B. Miller. The patent involves devices referred to colloquially (to plaintiffs' pleasure and defendants' discomfiture) as "cherry picker" cranes.[1] The parties involved are FMC Corporation, formerly known as Food Machinery and Chemical Corporation, which boasts that it is one of the sixty largest corporations in the country, and Daybrook-Ottawa Corporation, a subsidiary of the Young Spring and Wire Corporation of Delaware, which is also a corporation of some magnitude.

During the time covered by the present controversy, the defendant Corporation acquired the assets and liabilities of the Paul Hardeman Division of the Young Spring and Wire Corporation, which had previously merged with the Young Spring and Wire Corporation of Michigan, and became the survivor of the merger. The Young Spring and Wire Corporation of Michigan in November of 1958 purchased the so-called Strato-Tower Division of Moore's Time-Saving Devices, Inc., of Elkhart, Indiana, which in turn had acquired the business at some obscure time in the past from the Elkhart Boiler & Welding Company.

Along for the ride on the plaintiff Corporation's side is Mae C. Miller, the widow of the original patentee, Howard B. Miller. On the defendant Corporation's side are Shannon K. Clements, a very shrewd and clever engineer who describes himself as a "simple farm boy", a description which should fool nobody, and Hugh M. Rush, also an engineer, who claims to have dedicated his career to the development of the best possible personnel lifting device. Mr. Rush excused himself after he had testified, and Mrs. Miller gave up after a couple of weeks, but Mr. Clements stayed to the bitter end.[2]

Fifteen full days of trial were required merely for the presentation of evidence in this case. While no great number of witnesses were called, some were required to come from the Pacific coast. About three hundred exhibits were offered, some of them being files containing hundreds of pages of letters and documents. In addition to the numerous red herrings which were drawn across the trails, such other fauna as Giraffes, Industrial Monkeys, Steel Squirrels, and Giant's Arms struggled through the orchards and lurked in the underbrush.

All of this mass of testimony and evidence was heard, seen, and carefully considered by the Court, which acted as the trier of the facts, without the intervention of a jury. This opinion will be expressive of the Court's findings of fact, even though it may not be completely detailed in its discussion of evidenciary matters, and also of its conclusions of law applicable to the facts so painfully exhumed from the massive record.

Since the patent in question expired on September 28, 1965, some weeks before this action was commenced, the fundamental question of the validity of the Miller Patent is pretty much academic, except for the purposes of this lawsuit. It is, however, the threshold question to be determined in this matter.

█ It is not too difficult to reach the conclusion that the patent in question was valid. The basic principle which was novel and original is the articulated boom mechanism which, mounted upon a turntable and on a moving platform, enables a worker, by manipulating controls placed on a "perch" at the end of the boom, to move himself in all directions, "Right and left and round about, And up

---

1. e.g. "Greenville Police said they have a 110 foot cherry picker crane that will reach the catwalk * * *" Norwalk REFLECTOR, June 17, 1968, p. 1, and countless other newspapers and radio broadcasts.

2. This fact may be explained by certain provisions of Clements' license agreements; discussed infra, p. 11.

and down and in and out."[3] and position himself precisely where he needs to be.

None of the patents cited by the examiner in considering Miller's application either illustrated or recognized this ingenious idea. Most of them were concerned with the same basic problem, that of positioning a workman in space, but solved it either to a limited extent or not at all, and always by other and less flexible means than those claimed by Miller in his patent.

The defendant cited as prior art the Hulett, Havens and Clay patents. The first and last of these were not concerned with the same problem as the Miller patent. The Hulett patent, while it could move up and down and in and out relative to its platform, could move sideways only in relation to the ground. While the Clay patent involved an articulated boom, which could be raised and lowered, in relation to the ground, it clearly appears to be an apparatus which could only be operated from a fixed base, and it made no claim involving the vertical movement. The mechanism employed the articulation only to move the worker from side to side and in and out, and was so designed that if it had been turned on its side to change the horizontal movements to vertical ones, it must have broken down instantly. The Havens patent, which in the main was designed to attain the same end as the Miller patent, and is used for the same purposes as machines embodying Miller's invention, does not have the articulated boom, and thus lacks the flexibility of motion possessed by Miller's device. It could move in one direction only by sacrificing motion in another.

 Early in this litigation, this Court ruled that the fact that the inventor used the descriptive words "fruit-picker's" to modify the word "crane,"

and discussed mainly the use of his invention for tree work, did not limit the scope of the patent to machines specifically built for use in fruit-growing operations. In any event, the fact that those using the now numerous machines embodying the invention for such varied purposes as servicing rockets and rescuing suicidally inclined little girls from watertowers continue to refer to them as "cherry-pickers" indicates that the inventor's language, slightly altered, has been broadened 'to go along with his invention. There is thus no reason to change the earlier ruling in the light of such semantic matters, or to narrow the invention to the most limited meaning of the words employed.

 It is unnecessary to give further attention to the claims of invalidity based on the ground that the patentee's machine would not work, and that it was not commercially successful. Models prepared by defendants from the patent drawing indicate that a machine constructed exactly in accordance with them would not work very well. The defendant Clements testified very feelingly about this, since an early machine of this type pitched him out and fractured a number of his bones. But clearly, it would work. Clearly also, it was economically feasible, or there would not have been so many infringers.[4] The fact that plaintiff Corporation was not smart enough to take full advantage of what it had is hardly evidence of lack of usefulness of the invention.

 The Court concludes that the defendant Corporation has failed to overcome the presumption that the patent was valid.[5]

The second question is whether or not the patent was *infringed*. This problem needs no discussion. It is apparent at a glance that the defendants' "Strato-

---

3. From Thackery, "A Tragic Story".

4. Not only is infringement *evidence* of utility, but often defendant-infringers are *estopped* to deny utility. Kansas City Southern Ry. v. Silica Products Co., 48 F.2d 503, 505 (8th Cir. 1931), cert. de-

nied 284 U.S. 626, 52 S.Ct. 11, 76 L.Ed. 533.

5. 35 U.S.C. § 282 provides in part:
 "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it. * * *".

Towers" embody the same articulated boom which is the basic concept of Miller's invention. It would be impossible upon the evidence in this record to reach any other conclusion but that the defendant Corporation and its predecessors infringed upon plaintiffs' patent.

The real problems in the case occur in the area of whether or not the plaintiffs are entitled to recover *damages* for this infringement.

It must be recognized that this action was not commenced until October 28, 1965, some weeks after the patent expired, and there there is a six year statute of limitations on actions for patent infringement.[6] Thus, plaintiffs are entitled to recover damages, if at all, only from a period beginning October 28, 1959.

 It is undisputed that no actual notice of infringement was served upon the defendant Corporation until a letter dated July 16th, 1965, addressed to one of this defendant's predecessors, was delivered to this defendant on July 20th, 1965. Thus, unless the plaintiff can establish that the defendant Corporation and its predecessors had constructive notice of their infringement at some time prior to the latter date, plaintiffs' recovery must be limited to damages suffered during the period from July 20th to September 28th, 1965.

35 U.S.C. § 287 provides that in addition to actual notice of infringement, there may be constructive notice arising from marking articles made under the patent with a notice that they were made under the patent. Very seriously controverted questions of fact are presented upon this matter in this case, which have been belabored almost endlessly by the parties during the trial of the case.

It is only possible to come to a rational conclusion upon the various issues involved in this area by looking at the whole picture of the conduct of the parties to this litigation. The issues of fact and law are too intertwined and commingled to try to consider them in fragments.

The starting point of the story appears in the record with a visit of Howard B. Miller, an engineer of some ingenuity, to an apple orchard in the Pacific Northwest. He thought there ought to be a better way to pick apples than climbing up ladders, and set about to develop one. His efforts culminated with the application, in 1946, for the patent in suit, which was issued in 1948.

Naturally, of course, the problem of picking fruit had aroused the interest of many other people, both before and after Mr. Miller. Some of the minor cogs in the incredibly complex administrative machinery of the cumbersome plaintiff Corporation were interested in the problem. So was a man named Ormond Hukari. There are other shadowy persons with the same concern whose names appear fleetingly in the record of this case.

Mr. Miller discovered that the world does not beat a path to the doorway of inventors. While he was struggling with this sad fact, the plaintiff was trying to make something out of Mr. Hukari's fruit picker, the "Giant's Arm". In the course of this project, they discovered Mr. Miller's patent, the claims of which seemed to cover the "Giant's Arm".

Mrs. Miller's testimony indicated that all unbeknowing, at this psychological moment, Mr. Miller happened to drop into the plaintiff Corporation's office, saddened by failure to find a customer for his invention, and came out happily a few minutes later with a check for a thousand dollars for advance royalties and his faith in human nature restored. It is much more likely that he was *invited* to visit the plaintiff Corporation, which did not want to have its project gummed up by a possible infringement suit.

6. 35 U.S.C. § 286 provides in part: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action. * * *".

Whatever the case, on the third of January, 1950, Miller gave the Corporation an exclusive license under this patent.

The "Giant's Arm" turned out to be impractical. It could do the job, but no better than a ladder crew. Organizational changes were taking place in the plaintiff Corporation. The "Giant's Arm" project was terminated, and the machines constructed were consigned to limbo. They might have remained there had not plaintiff Corporation in response to one of defendant Corporation's numerous interrogatories, mistakenly mentioned them as experimental machines made under the Miller patent. The record is clear that the plaintiff Corporation has yet to make its first machine under this patent. It has confined its activities under the patent to sniping at some of those who realized how advantageous the invention could be.

In the meantime, a lot of people who were considerably smarter and more energetic than the plaintiff Corporation, which appears from this record to be an awful bumbler, were seeing the possibilities of Miller's invention. Miller himself seemed to be able to make little or no impression on the corporate jellyfish in whose tentacles he was enmeshed.

One of these people (the record names a large number of others) a Mr. Eitel, doing business under various names, but finally as Telsta Corporation, sought and obtained from plaintiff Corporation a sub-license under Miller's patent. Telsta was very properly behaved. It paid royalties, complaining sometimes of the plaintiff Corporation's failure to protect it from competition by those who did not. It marked its machines with the number of the Miller patent. In the murk of this record Telsta stands out "like a ripe banana in a smokehouse" [7] as a shining example of corporate probity. There was no evidence whatsoever that anyone but the good Telsta Corporation ever marked with the number of the Miller patent any of the machines produced under sub-licenses from the plaintiff Corporation.

On the other hand, the counter-claimants Clements and Rush went blandly on their way, paying no attention to Mr. Miller's patent. They checked up on it, were advised that it was probably valid, and that they were probably infringing on it, but apparently determined to take the chance. Whether they ever communicated their knowledge of these matters to those who employed them and were licensed to use their inventions is very doubtful. The evidence does show that Clements, at least, had strong financial motives for concealing his knowledge of these matters, since his agreements required him to save his licensees harmless from any claims of infringement.

In vain the virtuous Telsta Corporation complained, in 1958, that Clements and Rush, through the defendant Corporation's predecessor, Moore's Time-Saving Devices, Inc., was giving them competition by selling their "Strato-Towers" at ridiculously low prices. The plaintiff Corporation pocketed Telsta's royalty checks, sent Mr. Miller his cut, and placed Telsta's complaint in "File A".

Occasionally something would sting the plaintiff Corporation enough to arouse it from its lethargy and get it into some litigation to enforce the Miller patent. There is no evidence that the plaintiff Corporation had any particular enthusiasm for these battles, although it ultimately won them all, a fact by which it sets great store in argument.

It is quite clear, however, that large numbers of concerns were making devices utilizing the basic invention shown in the Miller patent. In deference to the patent, the people who actually used these machines referred to them as "cherry-pickers", but the infringers gave them fanciful names, and paid no royalties until the plaintiff, ponderously and slowly, took its adversaries one at a time and pinned their shoulders to the mat.

The plaintiff Corporation undertakes to excuse its behavior by indicating that

7. From Kipling "Just So Stories".

its claims to bigness are just for publicity purposes; that it is really an amorphous mass of miniscule divisions none of which knows what any of the others are doing; and that these little divisions cannot afford much patent litigation. These affecting pleas leave this Court strangely unmoved. The Court is equally unimpressed by the defendant Corporation's vociferous contentions that the plaintiff Corporation is actually a diabolically clever organization, whose devious central intelligence moves its divisions like pawns in a chess game, and would withhold the whip of the Miller patent from those infringers who used in their machines sufficiently large quantities of the valves manufactured by one of its divisions. Defendant Corporation suggests that it did not buy enough of plaintiff Corporation's valves, even though they were the very best valves on the market. Besides that, its fire-engines and aircraft servicing machines competed with those manufactured and sold by the plaintiff Corporation, and so it was punished by this lawsuit.

The record is silent as to why the plaintiff Corporation suddenly woke up six weeks before the Miller patent expired, scattered infringement notices broadcast, and wound up in a blaze of glory by starting this and six other infringement actions a month after the patent was *functus officio*.

Since that time, this matter has dragged on for almost three years, while a vast file of pleadings and briefs have accumulated, and the parties have desultorily engaged in what is laughingly referred to as "discovery". When the Court became increasingly insistent that the case be tried, the defendant Corporation came up with a counterclaim, alleging that certain machines manufactured and sold by the plaintiff Corporation infringed patents of Clements and Rush, under which the defendant Corporation was licensed, and that plaintiffs' activities in this regard violated the anti-trust laws, so there!

The evidence offered by defendant and the counter-claimants in support of the counterclaim was sketchy, to describe it charitably. Their excuses for waiting until a little more than a month before the date for trial to assert this counterclaim are feeble. The counterclaim was dismissed upon motion of the plaintiff Corporation at the close of the counterclaimant's case, for reasons which were fully stated by the Court in its ruling upon the motion, and will not be repeated here.

Upon this basis of facts stand the opposing contentions of the parties with respect to damages for infringement of the Miller patent for the period from October 29th, 1959 to July 20th, 1965.

The plaintiff Corporation does not seriously contend that substantially all of the machines made under its sub-licenses to use the Miller patent were marked with the patent number. It contends, rather, that during a limited period of some months around the time that the defendant Corporation's predecessor acquired the infringing business from Moore's Time-Saving Devices, Inc. in November, 1958, there was substantial marking which gave constructive notice at that time. The notice thus given would be binding upon all the successor corporations, including the defendant. The plaintiff Corporation further contends that constructive notice under the statute is unnecessary anyway, because the defendant Corporation and its predecessors all had actual notice, through their agent and employee Clements, of the Miller patent, its validity, their infringement, and that the plaintiff was prosecuting actions against other infringers.

The defendant Corporation disputes all of these contentions, and, virtuously quoting the maxim that "Equity aids the vigilant, and never those who slumber upon their rights," asserts that the plaintiff Corporation is guilty of laches so gross that it should be estopped from claiming any damages whatsoever for infringement of the patent, or even from claiming that the patent was valid.

Taking these considerations singly, the first problem deals with the matter of

marking at the time the defendant Corporation's predecessors got into the business. Plaintiffs' claim in this regard is based on evidence tending to show that at that time there were three concerns licensed and paying royalties under the Miller patent; that some ninety-six percent of the royalties were paid by Telsta Corporation, which did mark, and thus ninety-six percent of the machines produced under license were marked. Ninety-six percent is substantially all. Ergo, defendant's predecessor had constructive notice. Q.E.D.[8]

The Court detects a few flaws in this contention. One is that the evidence indicated that the amount of royalties paid was not directly proportionate to the number of devices sold. One of the companies which did not mark its devices was selling them for as little as one-tenth of the prices charged by the company which *did* mark.

The evidence also showed that during the limited period covered by the plaintiff Corporation's royalty figures, one very large manufacturer, which did not mark the devices it sold, had attempted to cancel the sub-license previously granted to it. This alleged cancellation was litigated successfully by the plaintiff Corporation, ultimately requiring the manufacturer to pay on the devices sold, but that did not change the lack of marking on the many machines sold.

The concept which underlies the proof of constructive notice by marking is that the infringer will see all the devices on the market but its own bearing the patent number, and will thus be forced to recognize that the invention is protected.[9] Obviously, if the infringer goes to a truck show, looks at two dozen competing devices, and sees patent markings only on one or two of them, the conceptual basis for notice fails. On the basis of the overwhelming weight of the evidence in this case, this exact situation prevailed at all times. One manufacturer marked. Nobody else, licensed or not, did. The plaintiff Corporation failed to establish constructive notice under the statute.[10]

However, this does not dispose of plaintiff Corporation's claims in this area, for it claims that the statutory methods of notice are not exclusive, citing cases to show that if an infringer has actual *knowledge* of the patent, of its infringement, and that there has been litigation between the patentee and other infringers, there is no need for statutory notice, either actual or constructive.[11] The defendant Corporation's claims of laches and estoppel cut squarely athwartwise of this contention, and in

8. Plaintiff cites Wm. Bros. Boiler & Mfg. Co. v. Gibson-Stewart Co., 312 F.2d 385 (6th Cir. 1963), as authority for the proposition that a patentee may collect damages from the time there was *marking*.
 This Court does not read that case to so hold. The Sixth Circuit merely states that a failure to mark or notify alleged infringers for a period after the patent's issuance will not cause the patentee to be denied damages for *all* later infringement, as the defendant there urged, but instead will limit his recovery to the period after which he *has* notified alleged infringers. The Court of Appeals there was not faced with a situation where the patentee marked for a short time and then stopped marking. Later cases citing the Wm. Bros. decision have construed it similarly. [cf., e.g. Briggs v. M & J Diesel Corp., 228 F.Supp. 26, 94 (N.D.Ill.1964)].

9. Wine Railway Appliance Co. v. Enterprise Railway Co., 297 U.S. 387, 394, 56 S.Ct. 528, 80 L.Ed. 736 (1936); Horvath v. McCord Radiator Co., 100 F.2d 326, 337 (6th Cir. 1938), cert. denied 308 U.S. 581, 60 S.Ct. 101, 84 L.Ed. 486 (1939), rehearing denied 308 U.S. 636, 60 S.Ct. 171, 84 L.Ed. 529.

10. c.f., Hazeltine Corp. v. R.C.A., 20 F. Supp. 668, 673 (S.D.N.Y.1937).

11. Warner v. Tenn. Products Corp., 57 F.2d 642 (6th Cir. 1932), cert. denied, 287 U.S. 632, 53 S.Ct. 83, 77 L.Ed. 548; International Nickel Co. v. Ford Motor Co., 166 F.Supp. 551 (S.D.N.Y.1958); T. C. Weygant v. Van Emden, 40 F.2d 938 (S.D.N.Y.1930); Oil Well Improvements v. Acme Co., 31 F.2d 898 (8th Cir. 1929); American Ornamental Bottle Corp. v. Orange Crush Co., 76 F.2d 969 (4th Cir. 1935); Nicholson v. Bailey, 182 F.Supp. 509 (S.D.Fla.1960).

this connection, at least, have some validity.

All of the cases cited by the plaintiff Corporation present situations markedly different from the present case. In most of them there had been some course of previous dealings,[12] or litigation,[13] or some form of actual notice from the *patentee* to the alleged infringer.[14] Here, however, the patentee's claims that the mere fact that an employee of the infringer was aware of the existence of the patent, and had secured advice that his machines probably infringed it, makes a strong distinction, especially in view of the fact that the infringer also knew that many other manufacturers were also infringing. The evidence failed to show that the infringer had knowledge of the details of the various lawsuits prosecuted by the plaintiff Corporation, but only that there was talk in the trade that litigation was being carried on. The evidence shows that at least one of the lawsuits was conducted so much *sub rosa* that not even the patent office files disclosed it.

■ Thus again the reasons for allowing recovery without the statutory forms of notice are not present here. The counter-claimant Clements, whose knowledge of the Miller patent is the basis for this claim, was not required to presume from his knowledge that the patentee was demanding relief from his actions.[15] The defendant Corporation's claim of laches and estoppel have some validity in this area. The evidence shows beyond a peradventure of a doubt that the plaintiff Corporation had actual notice of Clement's infringement in 1958, and a demand from one of its sub-licensees to do something about it. Its unexplained and unexplainable failure to do so much as to even send a postcard to Moore's Time-Saving Devices, Inc., destroys any equitable basis for its contentions in this regard.[16]

This conclusion is reinforced by the evidence of the Pitman Company's attempt to cancel its sub-license. Obviously, Pitman felt that if six or seven other concerns could manufacture infringing devices without so much as a letter from the plaintiffs, it should not be required to pay royalties for the privilege of doing so. The fact that the plaintiffs ultimately succeeded in rubbing Pitman's nose in the dirt does not change the carelessness of their habits. If they had behaved properly to begin with, they might well have avoided the battle with Pitman.

These conclusions avoid the necessity of ruling upon the difficult factual and legal problems of whether the character of the relationship of Clements and Rush to the defendant Corporation and its predecessors in the infringing Strato-Tower business was such as to make the employees' knowledge that of the employer, and whether the fact that under the complex business transactions that transferred the Strato-Tower manufacture by mesne conveyances to defendant Corporation in such manner as to make it liable for the infringements of *its* predecessors would also carry along constructive notice from marking, had there been such, at the beginning of the series. Probably the first of these questions

12. T. C. Weygant v. Van Emden, supra, at p. 940; Oil Well Improvements v. Acme Co., supra; American Ornamental Bottle Corp. v. Orange Crush Co., supra at pp. 970, 971.

13. Warner v. Tenn. Products Corp., supra, at p. 646.

14. International Nickel Co. v. Ford Motor Co., supra, at p. 567; *Nicholson v. Bailey*, supra, at p. 512.

15. Kilgore Mfg. Co. v. Triumph Explosives, 37 F.Supp. 766, 776 (D.C.Md. 1941); Smith v. Dental Prods. Co., 140 F.2d 140, 151, 2 (7th Cir. 1944), cert. denied, 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576; Son v. Pressed Steel Car Co., 21 F.2d 528, 9 (S.D.N.Y.1927); Franklin Brass Co. v. Shapiro & Aronson, 278 F. 435, 437 (3d Cir. 1921); Hazeltine v. R.C.A., 1 F.Supp. 758, 9 (S.D.N.Y.1932).

16. General Electric Co. v. Sciaky Bros., Inc., 304 F.2d 724, 727 (6th Cir. 1962); Whitman v. Walt Disney Productions, Inc., 263 F.2d 229, 231, 2 (9th Cir. 1958).

should be answered in the affirmative, and the second in the negative, but since it is not necessary to answer them, they will not be considered and resolved.

The ultimate result of the foregoing is that the plaintiffs are entitled to recover from the defendant Corporation damages, which shall not exceed a reasonable royalty, for its infringement of the Miller patent for the period of July 20th, 1958 to September 28, 1958. Even this simple matter has been made as complicated as possible by the parties.

The defendant refused to produce sales records, except under seal, and insisted that plaintiffs' attempt at discovery of sales and manufacturing figures should be satisfied by its counsel's statement as to total amounts. This matter was finally settled, after a fashion, by permitting plaintiffs to verify these figures by an audit, conducted by an independent auditor at defendant's expense. The figures the auditor produced did not agree with counsel's statement. Part of this disagreement resulted from the fact that there were errors with respect to delivery date in the invoice for one machine, priced at $7,947.20. Ultimately, it was determined that the correct delivery date was July 20th, 1965, the date upon which the actual notice of infringement was delivered. Defendant then claimed that this date should be excluded under the old rule applicable to determining time for pleadings, which excludes the first day and includes the last. This Court concludes that the date upon which notice of infringement was received should be *included* in the period for which damages are recoverable.[17]

There were also disputes about whether or not to include the sales price of a large triple-boom fire engine, which was ordered in March, 1964, and delivered October 15th, 1965, after the patent had expired; whether a royalty basis should include the price of the vehicle upon which the infringing Strato-Tower was mounted, and which in most cases was furnished by the purchaser, rather than by the defendant Corporation; whether the plaintiffs were entitled to damages based on machines ordered before the expiration of the patent, delivered during the period of the patent, or actually in process of manufacture before the patent expired; and what would be a reasonable royalty under the patent.

To dispose of these matters seriatim, the Court finds that under the evidence in the record, the only practical basis for determining damages is to consider the *delivery date* of the infringing devices. The manufacturing records were not kept in such manner so as to disclose when work was done on particular units.

The trucks not purchased and resold by the defendant Corporation should not be included in determining a royalty base. The evidence showed that the infringing devices could be, and sometimes were, used without being mounted on a truck, and the plaintiff offered no evidence from which the Court could even guess at the price of the truck chassises upon which the infringing devices were mounted.

There was no evidence offered from which the Court could possibly figure damages to the plaintiffs, except that of a reasonable royalty. The plaintiffs offered evidence that twelve percent of the sales price would be a reasonable royalty under such a basic patent; that one sub-license had been granted orig-

17. The principle stated by the defendant as controlling, which is embodied in Rule 6(a) of the Federal Rules of Civil Procedure, is applicable to *pleadings* and statutes of limitation, but not to service of *notice*. Decisional law dealing with notice under 35 U.S.C. § 287 generally has language which supports the plaintiffs' position that damages run from the date of receipt of actual notice. [c.f., e.g., Mathey v. United Shoe Machinery Corp., 54 F.Supp. 694, 701 (D. C.Mass.1944); International Nickel Co. v. Ford Motor Co., supra note 11, at 566.]

inally with a six percent royalty, but this had promptly been reduced to three and a half percent; that the royalties originally fixed in the plaintiff Corporation's exclusive licenses from the patentee had been reduced to one and one-half percent; and that substantially all the sub-licenses negotiated by the plaintiff Corporation carried a royalty of three and one-half percent. The defendant disdained to offer any evidence upon a subject so crassly commercial.

The Court concludes that on the basis of the facts as shown by the evidence, a reasonable royalty rate for a license to manufacture under the Miller patent during the last few weeks of its life is three and one-half percent; that during the time after the defendant Corporation received actual notice of infringement of the Miller patent, it delivered machines at a price of $86,-598.87; and that the plaintiffs are entitled to judgment in the amount of three thousand thirty dollars and ninety-six cents ($3,030.96), with interest at the rate of six percent (6%) from the twenty-fourth day of August, 1965.

There is no showing of any misconduct upon the part of the defendant Corporation, under all of the circumstances of this case, which would justify an award of attorney fees to the plaintiffs. The plaintiff Corporation's lack of diligence in asserting its rights robs the defendant's misconduct of much of its sting. It would be difficult to determine what would be reasonable attorney's fees in this case in any event. The amount of time and effort spent in the preparation and trial of this case on both sides is out of all proportion to either the complexity or importance of the issues involved. This Court could not in good conscience reward *anyone* concerned with the case beyond the amount of those damages which the law and the facts, as found herein, require.

Attorneys for plaintiffs may prepare and submit an order in accordance with the findings and conclusions expressed herein.